There were three counts in the bill of indictment.
The first, charging the defendant with feloniously killing his wife, by striking her with a stick, and by choaking, kicking and stamping her.
The second charges, that the defendant did feloniously strike his wife with a stick, and did knock, stamp and choak her, so that she became very weak, from such injuries, as well *Page 422 
as from previous sickness; and being thus weak of body, he drove her from his house at night, and left her exposed to the open air, from which two causes combined, to wit, the beating and exposure, the deceased came to her death.
The third count charges, that the defendant feloniously killed his wife, by exposing her to the open air, as set forth above.
The jury returned a verdict for the defendant on the first and third counts; and against him on the second.
The evidence on the case, applicable to the second count was:
Noah Preslar, a son of the prisoner and deceased, testified that he is about eighteen years old; a quarrel arose between his father, who was in liquor, and his mother, which continued for an hour or more, about a tract of land, in the course of which he kicked her about the knees, having his shoes on; afterwards he kicked her again about the same place; she then went out of doors, and he gave her a pretty severe kick in the side as she passed out; he followed her out, and taking her by the hand, told her to go into the house; she said, she did not want to go in; he told his little daughter, Rachel, to bring him the axe and stick, saying, he would kill her; these were brought, and then he gave a knife, which he had in his hand, open, to the daughter. The deceased then went into the house and sat down, whereupon, he (witness) went outside, and looked at the parties through a crevice in the wall, which was of logs; he saw the prisoner return into the house where his wife was, and, with a sound piece of sap pine wood, about two and a half feet long, and an inch square, strike the deceased a pretty hard blow on the head, she having on her bonnet at the time. The deceased then rose up and went into the yard; the prisoner followed, and caught hold of her about the waist; the witness then went up to his father, and told him he should let her alone, when he desisted. After this, the deceased went a short distance and sat down; the defendant sat down also, and after about five minutes, went into the house and laid down upon the bed, with his clothes on. In *Page 423 
about half an hour afterwards, the deceased proposed to the witness, to go with her to the house of her father, Mr. Broom, which was distant two miles and a half; he agreed to do so, and they started about seven o'clock at night, she taking along her infant child about nine months old, a bed-quilt and some clothing: after going about half a mile, she complained of being weary, and stopped to rest. After about five minutes, she proposed going on, which she did for about one fourth of a mile, when she again stopped to rest. She then proceeded some half a mile or three quarters further, when they came within two hundred yards of the house of her father she said she did not want to go to her father's till morning: she spread down the bed-quilt in the woods, and witness covered her and the child, and lying down himself, fell asleep, and slept till about two hours before day. The deceased then insisted that he (witness) should return home, which he did. The deceased was in a weak condition at the time, having just recovered from chills and an attack of the mumps: this was on the 21st. He next saw deceased at his grand-father's, Mr. Broom's, dead. On cross-examination, he stated, that they crossed several hills and a branch on the way: he said they carried the child and clothing alternately: he said when he left his mother in the morning she was not complaining: he further said, it rained some on the morning of that day.
Rachel Preslar, a daughter of the prisoner and the deceased, testified as to the blow with the stick, and said he kicked her four or five times about the knees, and once saw him have hold of her by the throat: the quarrel lasted about two hours. She went to bed, and did not know when the deceased left; said deceased carried nine yards of spun cotton with her, for she saw it at her grand-father's next day.
Martha Broom testified, that she is the step-mother of the deceased, and that she was at home on the morning of the 22nd of November spoken of. About day-break, she heard some one calling on Mr. Broom from without, and upon enquiry, found it to be the deceased: she got up and went out to her: found her about one hundred yards from the house, *Page 424 
lying across the road with her child upon her arm: the witness tried to help her up, but she was unable to stand. Witness then went and procured some bed-clothes for her to lie upon, and then called for Mr. Reynolds, a neighbor, who lived a quarter of a mile distant; he came and assisted in carrying the deceased into the house; she was in a fainting, exhausted condition, and they were compelled to stop twice on the way, to enable her to recover strength: the witness examined her but partially; found bruises on her legs, thighs and arms; the latter were rendered useless; deceased declined from that time; said she must die, and did die about five o'clock the next morning, (23d). She complained of weakness and misery all over; said that her husband had kicked her nearly all over; that he hit her on the head with a stick, and had choaked her: except a little coffee, she could swallow nothing, in consequence of a soreness of the throat, of which she complained; that she could not pass her urine, though she tried, and did not pass it till about fifteen minutes before she died; she fainted several times during the day, and seemed to be in great misery; she complained of cold; her hands and feet were numb from the time she came, until her death; didn't think she had a chill.
Hiram Reynolds says, he was called by Mrs. Broom, as spoken of by her, and speaks to very nearly the same matters as she: deceased could not stand; fainted down, and had to carry her to the house; they stopped to let her rest and recover herself; she was placed on some bed-clothing before the fire; said that the deceased said, before she awoke in the morning her child had escaped from her a little distance, and, that in attempting to recover it she had fallen, or was compelled to sit down through exhaustion. This witness admitted that he had said, "probably the deceased may have had a chill."
Lecy Broom, said she was a sister of the deceased; that she reached her father's about nine or ten o'clock on the night of the 22nd; said deceased said she was dying, and that the prisoner had beaten her all over; that she had lost all her *Page 425 
feeling; was numb; that her stomach and bowels gave her pain; examined her person after her death, and found bruises on her legs and thighs, and on the lower part of her stomach, which was much swollen, also on her hips, side, arms and neck.
Eliza Hays, another sister of the deceased, and Elizabeth Creaton, a mid-wife, gave a particular account of the bruises, c., and the latter said that the deceased said "he had kicked her about to death;" she did not examine whether deceased had a chill or fever.
Dr. McLaughlin testified that he is a physician and surgeon by profession, and was called to make a post mortem examination of the deceased for the jury of inquest; there were some slight wounds on the neck; her arms were bruised; there was also a bruise on the abdomen, which, on being cut, was found to extend inwardly some little distance, half an inch or so; the bruises were running together, and presented the appearance of mortification; she had bruises on her thighs, legs and arms; he did not examine the private part of her person; made no other examination by incision; her tongue was in a healthy condition; he gave it as his opinion, from the examination which he had made, and from the testimony he had heard, that the wounds, of themselves, were not mortal; that if she had remained at home, and been taken care of, she would have recovered; nor did he think the exposure, of itself, produced her death; his opinion was that the two causes combined had caused her death; that exposure alone would not have proved fatal so soon afterwards; there was no sign of fever; temporary stricture not unfrequently results from a wound in the region of the bladder; the internal evidences of the body, as far as he saw, were healthy.
The prisoner offered no evidence.
Among other things (not now relevant,) his Honor charged the jury, "that if the deceased left home under a well grounded apprehension of losing her own life, or suffering great bodily injury at the hands of the prisoner, in case she remained, with the object of seeking protection from her father, and *Page 426 
on the way, was exposed to the inclemency of the weather, from which cause, combined with the effects of the wounds, she died, when the exposure, of itself, would not have caused her death, the prisoner would have been responsible for the consequences, and guilty of murder." Defendant excepted.
"So, also, should they be of opinion that the wounds were not, in their character, mortal, and might, by suitable applications and proper care, have been cured, and not, of themselves have caused death, but, that they were so aggravated and made worse by the exposure to the weather, as to produce that result, it would be murder, provided, however, the deceased exposed herself through a well grounded fear of serious personal injury from the prisoner, if she remained at home, and not merely wilfully and without such sufficient cause." Defendant excepted.
"If, in the best exercise of her judgment, under the circumstances, she deemed the course pursued the most suitable to protect herself and infant, although the jury might not think it the most proper, still the prisoner would be responsible for the consequences, under the restrictions, and with the qualifications heretofore expressed." To this part of the instruction the defendant also excepted.
Verdict of guilty, on the second count, and not guilty, on the first and third counts. Judgment and appeal.
The jury having found the prisoner not guilty, on the first and third counts, we are to assume that the injuries inflicted upon the person of the deceased, were not sufficient, of themselves, to have caused her death, without the additional circumstances of her being exposed to the inclemency of the weather, by remaining out all night on the damp ground, in the open air.
The second count, besides the injuries inflicted upon the person of the deceased, charges, that the prisoner drove her *Page 427 
out of his dwelling house, and left her in the open air, and, that the injuries inflicted upon her person, together with the exposure, by being so left in the open air, caused her death. Upon this count, the prisoner was convicted.
The testimony in reference to the exposure is, after the prisoner had desisted from beating the deceased, she went off a little distance in the yard and sat down; the prisoner sat down also; after about five minutes, he went into the house, and laid down on the bed with his clothes on. In about half an hour afterwards, the deceased proposed to the witness (who was her son) to go with her to the house of her father, which was distant about two miles and a half. He assented, when she took a bed-quilt and some clothing, and her infant child, about nine months old, and they left together, about 8 o'clock at night. Another witness, a daughter of the deceased, says, she also took nine yards of spun cotton. On the way, she complained several times of being weary, and stopped to rest a few minutes; complained of her legs; she was a fat woman. When they got within some two hundred yards ofher father's house, the deceased said, she did not want to go to herfather's till morning, and spread down the bed-quilt in the woods; witness covered her and the child with the clothing, and remained there until about two hours before day, witness having fallen asleep, when she insisted on his returning home; he did so, and left her and the child alone, where they remained until daylight, when she was taken to the house.
Now, admit that, from this evidence, the jury were at liberty to infer, that the prisoner drove the deceased out of his house, there is no evidence to support the further allegation, that he left her exposed in the open air; in that scene of the tragedy, he had no part; she had arrived within two hundred yards of her father's house; there was nothing to prevent her from going on, but she chose, of her own accord, to remain out all night, exposed on the damp ground.
We can see nothing in the evidence to support the suggestion made by his Honor, in explanation of this conduct on her part; after charging, that if she voluntarily exposed herself, *Page 428 
when she could have gone into her father's house, the prisoner was not responsible, he adds, "but, if, in the best exercise of her judgment, under the circumstances, she deemed the course pursued the most suitable toprotect herself and her infant, although the jury might not think it the most proper, the prisoner would be responsible." Where is the evidence that she remained out all night, for fear that her husband would pursue her? Taking the bed-clothes and the spun cotton, when she left home, indicated a certain degree of deliberation, and it would have been a strange idea, to be out all night by the side of the road, instead of seeking shelter, at once, under her father's roof, had she apprehended further violence.
If, to avoid the rage of a brutal husband, a wife is compelled to expose herself, by wading through a swamp, or jumping into a river, the husband is responsible for the consequences; but, if she exposes herself thus, without necessity, and of her own accord, we know of no principle of law, by which he is held responsible, to the extent of forfeiting his life.
 PER CURIAM. There is error; let there be a venire de novo.